## Mason et al., Commissioners, v. City of Philadelphia et al.

*Henry S. Drinker*, for petitioners.

*David J. Smyth*, city solicitor, *Graham C. Woodward*, *J. Louis Breitinger*, *James Hall Prothero*, and *Ernest Lowengrund*, for respondents.

FINLETTER, P. J., July 1, 1935.—City council failed, in January of this year, to make any appropriation for

the purpose of sinking the city's loans at maturity. It did this notwithstanding the sinking fund commission had passed a resolution that $7,771,780 was needed for that purpose, according to a standard of computation fixed by the commission 2 years ago at the request of council.

This inaction of council is the result of a position which it has taken, that the discretion lies with it to fix the amount needed to comply with the constitutional and statutory and loan contract requirements.

The sinking fund commission denies this right to council, and asserts that it is the right and duty of the commission to fix the amount of the needed instalment, and to insist, even by litigation, upon its payment.

The question before us is put by the plaintiffs as follows: "Whether under the statutes and ordinances creating the loans, the discretion in fixing the discount rate (which in effect means the amount to be paid) has been confined to the sinking fund commission, or to the city council, or to the controller."

To this we must add the further question: Whether there is any discretion on the subject in any of these officials.

No claim of abuse of legitimate authority is made by either party. The contesting claims go deeper, and each party denies any legal authority in the other.

As a matter of fact no express authority is given to any agency by ordinance, statute or Constitution.

The pertinent statutory provisions are as follows:

The sinking fund commission was created by Ordinance of May 9, 1857, p. 188, as "Commissioners of the several Sinking Funds of the City of Philadelphia which are now existing or may hereafter be created." It also provided that the city treasurer should be the custodian of the property of the sinking funds, "subject to the directions of the said Commissioners, and under their in-

structions" as to investments. Their duties are defined as follows:

"First. To meet at the office of the City Treasurer on the first Monday of every month, and receive from the said City Treasurer a report of the amounts in his hands due to the said Sinking Fund, whether the same be from the receipt of taxes, or corporate income, or income from the investments of the said fund.

"Second. To cause the City Treasurer to invest all such amounts so received by them without delay in the purchase of the funded debt of this corporation, and the investments so made shall be in the joint official names of the said Commissioners, describing them as such.

"Third. To report their proceedings and the state of the fund in their charge to the Councils, quarterly, and whenever required to do so by the said Councils.

"Fourth. To keep minutes of their proceedings and the transactions of their business, and cause the same to be recorded in a book to be kept for that purpose."

There is no ordinance or statute expressly giving the city council any control over the sinking fund except to elect a member.

The commission gained a legal status, independent of the city, from the Bullitt Act of June 1, 1885, P. L. 37, and the City Charter Act of June 25, 1919, P. L. 581, both of which statutes provide that "the Sinking Fund Commission shall continue as now established by law."

The Constitution provides, in article xv, sec. 3, that a sinking fund shall be provided for every municipal loan created, "which shall be inviolably pledged for the payment of its funded debt." Article ix, sec. 10, provides: "Any . . . municipality incurring any indebtedness shall . . . provide for the collection of an annual tax sufficient to pay the interest and also the principal thereof".

This provision is enforced by the Acts of April 20, 1874, P. L. 65, sec. 2; April 13, 1897, P. L. 17, sec. 1;

April 28, 1915, P. L. 195, sec. 1; and May 16, 1929, P. L. 1778, sec. 1.

The City Charter Act of June 25, 1919, P. L. 581, provides in article XVIII, sec. 8, as follows:

"Sec. 8. Whenever any debt shall be or shall have been created for which the Constitution of this Commonwealth requires a sinking fund to be established, the proceeds of the taxes levied for the payment of the principal and interest of such debt and all other money pledged or appropriated for the payment of the principal and interest of such debt shall be paid into the sinking fund of such city, and shall be inviolably reserved for, and applied exclusively to, the payment of the principal and interest of such debt."

In every ordinance creating a loan it is provided:

"Whenever any loan shall be created by virtue of this ordinance there is by force of this ordinance an annual tax levied of . . . . . . per centum on the par value of such bonds and certificates so issued to pay the interest, also the principal of said loan, within . . . . . . years, together with the state tax thereon; and the proceeds of the tax so levied are hereby annually appropriated . . . to the Commissioners of the Sinking Fund a sum sufficient to pay the interest on said loan, also the principal thereof, within . . . . . . years and as the same becomes payable, and to the City Treasurer a sum sufficient to pay the State tax thereon; the appropriation for the interest to be paid semi-annually, and for the sinking fund quarterly, to the said Commissioners."

This covenant is part of the city's contract with its bondholders.

It will be observed that in none of this legislation is there any provision lodging a discretion, as to the annual instalment, in any officer or board. All that is required is that a sufficient sum shall be paid.

The amount needed annually is a sum sufficient to sink the loans at maturity. A crude way of arriving at these

annual sums (and it would follow the literal language of the statutes) would be to require the payment annually of a proportionate amount of the principal; for example, in the case of a loan maturing in 30 years to require the annual payment of one thirtieth of the principal. This would require no discretion on the part of any agency, but obviously it would be both absurd and unnecessary, because it leaves out of consideration the earnings by way of interest on the sums paid in. When and as these accrue they go to the credit of the sinking fund and are also themselves later invested, so that a sum greatly less than a proportionate payment is all that is needed to create an adequate sinking fund.

It is true that the determination of this amount requires the exercise of great judgment, financial knowledge and foresight. The present state of the securities market, the outlook for the future, and all the considerations which move a careful investor, enter into the problem. So that the duty of the agent in charge is no longer a mere insistence upon the payment of a thirtieth of the capital. It is one which requires great financial skill.

It is argued for the plaintiffs that the purpose of the sinking funds is to raise a fund to protect the loan which is adequate and beyond the control of the borrowers, and that this is to the interest of both parties.

From the point of view of the lender, the purpose of the fund is to protect the loan. From the point of view of the city it is to make the loan as attractive and secure as may be, so that city bonds may realize the highest price. To leave the fixing of the amounts to be paid into the fund to council, that is, to the borrower, would put the lender at the mercy of the borrower and defeat the purpose of the fund, and the intentions of both parties. While it is true that the courts would intervene to prevent an abuse, a lender is not apt to regard a sinking fund which requires an annual lawsuit as a very valuable security. The un-

doubted result would be difficulty in placing city loans and lower prices for them.

Again it is argued that if the commission is to be a mere bookkeeping, clerical committee, with no power except to hold the funds, it seems hardly worth while to have created it. If their only duty is to act as custodian, the city treasurer could as well hold them.

But it must be said, in answer to the first argument, that to lodge a discretion with the commission or anyone else, would put the officer to whom the discretion is given in a position to violate the contract which requires a sum sufficient in fact to sink the loan, independent of the discretion or opinion of anyone except of course, in case of abuse, the judgment of the court. And in answer to the second suggestion the commission has ample ground for existence, apart from a discretion in computing the annual instalments, in the custody it has of the sinking fund, apart from the city's general funds, and the duty of investing it.

The magnitude of the financial obligation put upon the commissioners may be realized when it is known that the city's outstanding debt amounts to $555,145,300.

Again it is argued that the make-up of the commission is ideal if we are to regard it as a body created to serve the purposes of all parties to the loan. All interested parties are represented upon it, the mayor and council standing for the city, the controller, a county officer, and a private citizen representing the general public, while the whole commission is, city's counsel says, "a quasi-trustee for the lender."

It is pointed out by the commission that in 1932 the city council recognized that the commission had the right to compute the instalment, or discount, by "requesting" it to reduce the ratio to 3¾ percent. The interpretation placed by the parties upon a contract or other document in question, as that interpretation is shown by their conduct, is a legitimate consideration.

Of course the position taken in 1932 is contradictory of council's present position. If it had the power it now claims, no request would have been needed. Council could have done as they did in the instant case, disposed of the subject by ordinance without consulting the commission.

But on the other hand the ordinance books show that city council has taken part, in many instances, in the management of the sinking fund. There are ordinances authorizing investments in securities, selection of bank depositaries, and the like subjects. Practice in the past therefore casts an uncertain light upon the subject.

The powers and duties of the sinking fund commission were discussed by the Supreme Court in Brooke v. Philadelphia, 162 Pa. 123, 130, 131, where the court said:

"So far, then, as relates to the general public, among whom are these plaintiffs, what is called the sinking fund is the mere conduit, through and by which the money raised by annual taxation reaches its destination; it goes into the fund for a specific purpose, to which it is inviolably pledged; when there, the commissioners must see to it that it accomplishes its purpose, the payment of the funded debt of the city. . . .

"If payments be not made into the fund for the redemption or purchase of the funded debt, as required by law, the commissioners must see to it that such payments are made, even to the institution of legal proceedings to compel annual payment by the city. The commissioners, in our view of their duty, are not, as has been suggested in the argument, mere city clerks or bookkeepers; they are invested with high powers, involving very weighty responsibilities."

It must be observed, however, that this case loses considerable force upon the question we are discussing, to wit, the exercise of a discretion, for at the time it was decided there was no opportunity for exercising any discretion whatever by either council or the commissioners,

because the statute required the payment of a fixed amount, to wit, 8 percent of the amount of the loan.

Finally it is evident that neither Constitution nor statute gives a discretion to anyone to fix the amount of the annual amortization payment. The ordinance defining the commissioners'·duties (which by statute are to continue as heretofore) is silent on the subject. It is true the commission is a carefully selected, perhaps disinterested body, it is true it has charge of immense sums of money which it may invest, and upon which the credit of the city depends, but it is given no discretion to fix the amount due for amortization of the loans. In the nature of things it could not, for that would be to alter the contract. It has no power to alter a city contract. The law, the Constitution and the contract fix the amount to be paid as "sufficient to sink the loan at maturity." This is a fixed amount which does not depend on the discretion of anybody. It may be difficult to compute. It may require skill to compute it. But it must be computed and paid no matter what the commission, the council, or the controller think about the amount.

This matter comes before us on a demurrer to the returns·of the respondents. The legal effect of this is that we must assume the truth of the facts set out in the returns. If there is a conflict of fact between the plaintiffs and the respondents we must, at this stage of the case, take as true the averments of the respondents.

While the commission has no discretion about the amount due, it undoubtedly has the right to compel the payment of the proper amount, when that is ascertained as a fact. Brooke v. Philadelphia, supra, so holds. While that case is no authority for the existence of a discretion with the commission, it is full authority for its right to insist upon the payment of the sum due. Either a bondholder or the commission may bring proceedings to that end. Indeed we are of opinion that the commission may

sue either in its own name or to the use of participating bondholders.

We are also of opinion that we may regard these proceedings as founded upon the commission's right to insist on the payment of the proper sum, notwithstanding they put their right on the exercise of a nonexistent discretion.

And this brings us to the first subject above mentioned, to wit, the necessity we labor under of accepting the facts as they are alleged by the respondents.

Fortunately the basis of the respondents' position has been fully stated in their answers, so that we are able to pass upon the dispute.

The respondents have included in their answers the reports of their experts, which show the methods by which they arrived at their conclusion that nothing is due by way of an amortization payment for 1935.

While we are confined to facts alleged in the returns in reaching our conclusion, we may exclude from the computation any items which as a matter of law should not have been included, and may include any items appearing in the answers which have not been given their proper effect.

The experts retained by the city arrived at the conclusion that no sinking fund payment was due for 1935. This result they reach by crediting an item paid into the sinking fund for support of the bonds issued for the Delaware River Bridge to all the other sinking funds for other purposes. Their theory is that all the loans should be added together and moneys paid on one loan in excess of the needs of that loan should be credited to the others. And they say that if the $9,994,345.36 paid to the city for its interest on the bridge is not devoted specially to the bonds issued to pay for the bridge, but is credited generally to the total of sinking funds created for other loans, the total amortization payment needed would be, they concede, $7,667,-025.04, which is substantially the amount the commissioners of the sinking fund say should be paid. But the

experts say that there is a "surplus" existing from over-payments of many of the other loans which amounts to $9,262,385.19. This they use in their computations to wipe out the requirement for 1935, leaving what they call a net "surplus" of $1,595,360.15.

But they cannot do so. There is no single sinking fund, as they assume. There is a sinking fund for each loan, which according to Constitution, statute and contract of the city is "inviolably pledged" to each loan as issued. It is no answer to say that every loan is issued upon the general credit of the city. So it is, but it is also issued upon the additional security provided in each contract, among which in every case is a sinking fund by its express terms to be applied to "such" loan. The experts would take over payments on one loan to pay another. This they do by the device of calling them surpluses. As a matter of fact they are sums expressly paid on a particular loan, out of a tax levied particularly for that loan and by Constitution and contract inviolably pledged thereto.

The fallacy of this ciphering is the attempt to treat the sinking funds as an aggregate fund and to offset over-payments on one against deficiencies in another. This offends against the Constitution, which provides: "Any . . . municipality incurring any indebtedness shall . . . provide for the collection of an annual tax sufficient to pay the interest and the principal thereof": Article IX, sec. 10.

It offends against the City Charter Act of June 25, 1919, P. L. 581, which provides, in section 8:

"Whenever any debt shall be . . . created for which the Constitution . . . requires a sinking fund . . . the proceeds of the taxes levied for the payment of the principal and interest of such debt . . . shall be paid into the sinking fund of such city, and shall be . . . applied exclusively to the payment of principal and interest of such debt."

It is obvious that this refers to each debt as it is created.

It offends against the contract by which each loan is created, for every ordinance creating a loan provides, and the provision becomes a covenant of the contract, that:

"Whenever any loan shall be created by virtue of this ordinance, there is by force of this ordinance an annual tax levied of . . . . . . per cent of the par value of the bonds so issued, to pay the interest and principal of *said* loans, &c."

The meaning of these provisions is clear, that the entire proceeds of the taxes referred to shall be paid into a sinking fund for that loan. There is nothing to permit the payment of part of the proceeds of the tax levied for this special purpose, and certainly no provision for withdrawing any of the proceeds already paid and devoting them to any other purpose, either general expenses, or payment for the benefit of another loan: Corporation for the Relief of Widows v. Philadelphia, 317 Pa. 76.

In the case cited, Mr. Justice Simpson, who wrote the opinion of the court, twice quoted the provisions of section 8 of the City Charter Act as follows:

"Under the statutes relating to the City of Philadelphia, all moneys pledged or appropriated for the payment of the principal and interest of a particular municipal debt, must be paid into the sinking fund of the municipality, and are inviolably reserved for and must be applied exclusively to the payment of the principal and interest of such debt."

We regard the respondents as admitting that $7,667,025.04 should be paid into the sinking funds for 1935 unless the "surpluses" of other loans may be diverted to this purpose. Since they cannot, the city council must appropriate and pay to the sinking fund commissioners the sum named, to wit, $7,667,025.14.

And now, July 1, 1935, it is ordered that the Mayor of the City of Philadelphia, J. Hampton Moore; the city council of said city and each and every of its members, to wit, Edwin R. Cox, Charles J. Pommer, Bernard Samuel,

Harry J. Trainer, Phineas T. Green, George Connell, Maurice E. Levick, James G. Clark, Edward A. Kelly, Simon Walter, Frederic D. Garman, Clarence E. Blackburn, Frank L. Kenworthy, Richard S. Harris, Samuel Emlen, Morris Apt, Windom Bryant, John J. McKinley, Jr., Clarence K. Crossan, and John J. Daly, appropriate, provide for and cause to be paid to the Commissioners of the Sinking Fund of the City of Philadelphia, from moneys received from taxes levied to provide the sinking fund payments on the several city loans, forthwith the sum of $3,833,507.52, and on each of the last days of September and December the sum of $1,916,753.76, to provide the amount sufficient and necessary to meet the principal of the several loans of the City of Philadelphia as they respectively mature; and that WillB Hadley, city treasurer, and S. Davis Wilson, city controller, draw and approve the required warrant or warrants and do and perform all necessary and proper acts pertaining to their offices in order that the aforesaid sums be paid to and deposited with the commissioners of the sinking fund to provide the sum necessary and sufficient to meet the principal of the several loans of the City of Philadelphia as the same shall respectively mature.